# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39937**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Caleb W. HUMPHREY**
Technical Sergeant (E-6), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 14 March 2022

————————————

*Military Judge*: Matthew P. Stoffel.

*Sentence:* Sentence adjudged 19 February 2020 by GCM convened at Joint Base Pearl Harbor-Hickam, Hawaii. Sentence entered by military judge on 26 March 2020 and reentered on 30 March 2020: Dishonorable discharge, confinement for 3 years, forfeiture of all pay and allowances, and reduction to E-1.

*For Appellant:* Major Amanda E. Dermady, USAF; Captain Alexandra K. Fleszar, USAF; Mark C. Bruegger, Esquire.

*For Appellee*: Lieutenant Colonel Matthew J. Neil, USAF; Major Abbigayle C. Hunter, USAF; Captain Cortland T. Bobczynski, USAF; Mary Ellen Payne, Esquire.

Before KEY, ANNEXSTAD, and MEGINLEY, *Appellate Military Judges*.

Judge MEGINLEY delivered the opinion of the court, in which Senior Judge KEY and Judge ANNEXSTAD joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

MEGINLEY, Judge:

Contrary to his pleas, a general court-martial composed of officer members convicted Appellant of one specification of child endangerment by culpable negligence resulting in harm against his daughter, AB, in violation of Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934, and one specification of aggravated assault by a means or force likely to cause grievous bodily harm against AB, in violation of Article 128, UCMJ, 10 U.S.C. § 928.[1] The members sentenced Appellant to a dishonorable discharge, confinement for three years, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority suspended the adjudged forfeitures for six months from the entry of judgment, at which time, unless the suspension was sooner vacated, the suspended forfeitures would be remitted without further action. The convening authority also directed all automatic forfeitures be waived for a period of six months for the benefit of AB. The convening authority took no other action on the sentence.

Appellant raises ten issues on appeal:[2] (1) whether the military judge abused his discretion by allowing the Government to introduce evidence of Appellant's knowledge of the severity of seizures in infants; (2) whether the panel's exceptions and substitutions regarding Charge II and its specification (aggravated assault) represent a fatal variance; (3) whether his conviction for aggravated assault is factually and legally sufficient; (4) whether his conviction for child endangerment is factually and legally sufficient; (5) whether trial counsel engaged in prosecutorial misconduct during opening, closing, and sentencing argument; (6) whether the Government's inclusion of an erroneous Department of Defense Form 2701-1 warrants correction;[3] (7) whether the convening authority's failure to take action on the whole sentence warrants a remand for proper post-trial processing; (8) whether the staff judge advocate's first indorsement to the corrected Statement of Trial Results is incorrect; and (9) whether the military judge erred by precluding evidence of Appellant's

---

[1] All references in this opinion to the punitive articles of the UCMJ are to the *Manual for Courts-Martial, United States* (2016 ed.). The charges and specifications were referred to trial after 1 January 2019; accordingly, unless otherwise noted, all other references to the UCMJ, Military Rules of Evidence, and Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] We reordered Appellant's assignments of error.

[3] The Statement of Trial Results, produced in accordance with Air Force Instruction 51-201, *Administration of Military Justice,* ¶ 12.15.4. (18 Jan. 2019), now takes the place of Department of Defense Form 2701-1, *Report of Result of Trial*; the use of the form was erroneous but had no impact on Appellant's case or sentence.

spouse's mannerisms and interactions with their child.[4] On 24 February 2022, we granted Appellant's motion for leave to file supplemental assignment of error (10), whether Appellant was denied his Sixth Amendment[5] right in light of *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020). In addition to these issues, we address the issue of timely appellate review.

We have carefully considered issues (5),[6] (6), (8), and (9), along with Appellant's supplemental assignment of error (10), and find those issues do not warrant further discussion or relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). With regard to issue (4), we find Appellant's conviction of child endangerment by culpable negligence resulting in harm to AB factually insufficient. However, we affirm a conviction of the lesser-included offense (LIO) of child endangerment by culpable negligence and reassess Appellant's sentence. With regard to the remaining issues, we find no error that materially prejudiced Appellant's substantial rights, and following this court's Article 66(d), UCMJ, 10 U.S.C. § 866(d), mandate to affirm only so much of the findings and the sentence as we find, on the basis of the entire record, should be approved, we affirm the findings as modified, and the sentence as reassessed.

## I. BACKGROUND

Appellant entered active duty service in April 2010. At the time of the allegations, Appellant was married to Senior Airman (SrA) NB and both he and his wife were stationed at Joint Base Pearl Harbor-Hickam, Hawaii. On 10 April 2016, the couple's first child, GB, was born. On or about 5 May 2016,

---

[4] Appellant personally asserts issues (2), (6), (9), and Appellant's supplemental assignment of error (10), pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[5] U.S. CONST. amend. VI.

[6] Appellant believes trial counsel engaged in prosecutorial misconduct during opening statement, and closing and sentencing arguments, by "treating a conjunctive element as disjunctive, thereby constructively amending the charged offense of child neglect [Charge I and its specification] so as to broaden the potential bases for conviction." In this regard, Appellant focuses on the language in the specification alleging Appellant endangered AB by failing to obtain medical care for AB "after [AB] was injured *and* had a seizure." (Emphasis added). Appellant states that during the arguments, trial counsel put forth an alternate form of liability, in that Appellant was "alternately liable for failing to seek medical attention after AB was (1) injured, *or* (2) had a seizure." (Emphasis added). At no point did Appellant's defense counsel object to trial counsel's argument on this issue. Having reviewed the record, we did not find any instances of trial counsel making the alleged argument, and likewise do not find any error let alone plain error.

Appellant and SrA NB brought GB to the hospital for an evaluation because of excessive drowsiness concerns. On 6 May and 7 May 2016, GB experienced seizures. Doctors at nearby Tripler Army Medical Center (TAMC) evaluated GB and diagnosed him with hemorrhagic encephalitis due to herpes simplex virus (HSV). Despite treatment efforts, GB passed away on 20 May 2016.

**A. Events prior to 10 July 2017**

On 3 July 2017, AB was born to Appellant and SrA NB in Honolulu, Hawaii, and was released from the hospital on 6 July 2017. According to medical records dated 7 July 2017, there were no significant issues with AB's delivery or well-being, and she was healthy. However, AB was taken to an appointment this same date because she had elevated bilirubin levels which were being monitored by her medical providers.[7] The 7 July 2017 medical record, introduced at trial, noted AB was alert, well-developed, well-nourished, active, and not fussy. AB's medical record also specifically noted there were no injuries to her skull and she had normal movement of all extremities. The record did note she had jaundice of the face, but no skin lesions. Overall, there were no signs of any injuries. As described by Lieutenant Colonel (Lt Col) (Dr.) KD, the staff supervising pediatrician at TAMC, who testified at Appellant's trial based upon AB's medical records, this was a "very uncomplicated visit."[8]

The next day, 8 July 2017, AB had another follow-up appointment because of her elevated bilirubin levels. Again, she was reported to be "well-developed," "well-nourished," "in no acute distress[,] alert," and had normal stools; no signs of injury were observed. Based upon what she saw in the records, Lt Col KD testified, "this baby look[ed] healthy."

**B. Events of 10 July 2017**

At 0841 on 10 July 2017, using Facebook Messenger,[9] Appellant communicated with MM, the wife of one of Appellant's friends. MM was a registered nurse, and she and her husband were also stationed in Hawaii. During this

---

[7] According to testimony at Appellant's court-martial, bilirubin is the result of the body breaking down red blood cells. Elevated levels can be toxic and lead to brain damage.

[8] Lt Col KD was a board certified pediatrician, with a specialty in pediatric hematology oncology—"blood and cancer," in her words. Lt Col KD stated she had seen over 10,000 patients at the time of trial. Lt Col KD was not personally involved in AB's medical care until 12 July 2017, but she provided testimony as to the contents of the earlier medical records.

[9] Facebook Messenger is a social media messaging application.

conversation, Appellant told MM about SrA NB's follow-up medical appointment, as well as AB's medical appointment the day before, letting her know that AB's appointment "was fine" and that AB "gained weight and [her] bilirubin was down." There was no mention of AB having any injuries or issues with the appointment.[10] Appellant and MM sent messages back and forth as part of this conversation until 0912.

Also on the morning of 10 July 2017, SrA NB left her off-base home to go to the commissary. During this time, Appellant was home alone with AB on parental leave. While SrA NB was gone, at 0847, Appellant texted SrA NB letting her know he was "about to rake the yard." At 0948, Appellant texted SrA NB to let her know that AB "had other plans." At 0954, Appellant texted SrA NB, "[AB] like smacked her face hard into my shoulder."[11] He then texted, "Now, I can't console her [ ]," and, "Yeah, her face looks like it's swelling."

At 1004 and 1005, Appellant texted SrA NB, "I'm laying down . . . need a little break. [AB is] always so[ ]vocal with me." He also let SrA NB know he did not rake the yard. When SrA NB expressed disappointment that Appellant had not done the yardwork, Appellant said, "I'm sorry, [AB has] been yelling at.me.all morning." Subsequent texts show SrA NB responded, "Maybe when I get home, I'll watch her and you can do it. Set up the grill and stuff."[12] Later analysis of Appellant's phone concluded Appellant deleted this conversation at some point.

From AB's birth until 9 July 2017, Appellant took photos of AB every day. None of those photos reflect bruises, swelling, or any other injuries. According to the government forensic examiner who reviewed Appellant's phone, Appellant did not take any photos of AB on 10 July 2017. However, on 11 July 2017, Appellant took multiples photos of AB. In those photos, AB had bruises on her left eye socket, the left side of her face, and along her left jawbone.

## C. Events of 12 July 2017—Conversation with MM

On 12 July 2017, at 0848, Appellant took a 26-second video of AB having what appeared to be a seizure. At 0856, Appellant sent the video of AB to MM

---

[10] The court notes there does not appear to be any record of a medical appointment for AB on 9 July 2017. There are medical records for AB from an appointment on 8 July 2017.

[11] Text message exchanges in this opinion are taken verbatim from evidence in the record of trial and introduced at trial and include misspellings and punctuation errors where not corrected.

[12] SrA NB did not testify at Appellant's court-martial.

via Facebook Messenger. As the Government describes in its answer to Appellant's assignments of error, "In that video, AB was repetitively jerking her right leg while twitching her eyelids. She also repeatedly moved her head and mouth while her right eyelid continued to twitch. In that footage, AB can be observed with a black eye." After he sent the video, Appellant asked MM, "What does this look like to you?"[13] At 0934, nearly 40 minutes later, MM viewed the video. The following messages were then exchanged:

> [MM:] Hmm, I don't know. Are you guys going to take her to [T]ripler?
>
> [Appellant:] She seems fine now[.] She did just spit up a lot[.] So I'm thinking it could be a reflux kind of thing[.] She's had difficulty eating, so there's that[.] But…I've gotten her through about 1.5-2 oz each feeding[.]
>
> [MM:] Difficulty how? Like latching or shes having trouble swallowing?
>
> [Appellant:] Usually by squirting it[.] She was latching great[.] She does great at the breast, just terrible with a bottle[.] She'll keep falling asleep[.]
>
> [MM:] Oh, maybe the bottle flow is too fast for her?
>
> [Appellant:] That could be.true. I'm.so new to.this Idk[.] (I don't know)
>
> [MM:] Yeah, bottles flow a lot faster and easier than the breast so it could be overwhelming her. Are they slowflow nipples or the bottle? On the bottle*
>
> [Appellant:] No, just the regular ones[.] I'll look into those[.]
>
> [MM:] Yeah, I'd buy some slow flow nipples.
>
> [Appellant:] We are gonna try co-sleepimg[.]
>
> [MM:] But I don't want to scare you or anything, I've never seen a newborn move like that. Like the repetitive jerking or her leg and eye. If I were you guys I would either take her to [T]ripler

---

[13] In his brief, Appellant states,

> The video itself shows AB's right leg jerking for several seconds before stopping, with her right fist clenched throughout. AB's left hand is also closed for the majority of the video, but she opens it towards the end and moves her right arm. AB's eyes appear to be moving and her mouth alternately opens wide and closes slightly, while her chest contracts several times.

or call the pediatrician and ask to send him/her that video to see what they think. I thought maybe it was hiccups at first, but after rewatching it a few times I would have a pediatrician look at it.

[Appellant:] Ok, that seems fair. I'll see if it persists then go about it. This is the first time it happened[.]

[MM:] How long was she doing it?

[Appellant:] For that split second[.] Cause she immediately stopped after that and started crying[.] I was looking into silent reflux…seems similar[.] It's that jerking that concerns me[.]

[MM:] Yeah, that is what concerns me too[.]

[Appellant:] She's still hiccupping though[.] We will call and see.[ ] I'm also feeling silly, cause she smacked her face into my shoulder[.]

[MM:] Okay good, hopefully it is nothing to worry about, but it is good you have the video to show them if they want to you to come in[.]

[Appellant:] She swung her head back…and when I caught it, I over corrected and bruised her face [sad emoji face][.] Don't want them thinking I beat my child[.]

[MM:] Aww, it is the worst when you accidentally do stuff like that. I don't think anyone would think that[.]

[Appellant:] Ok, I just don't want that[.]

[MM:] Is it on her left eye?

[Appellant:] Yeah[.] The whole left.side of her face[.]

[MM:] Okay well don't let a bruise stop you from taking her in to get checked out. If they have questions about it, I would just tell them the truth.

[Appellant:] I am[.] I'm not going to not take her.in][.]

[MM:] Oh okay[.]

[Appellant:] Idk..it[']s just a thought you know? I get nervous[.]

[MM:] Ohhh I misread[.] I thought you just said "I'm not going to take her in." And I was like huh? Haha[.]

[Appellant:] Noooo[.] I wouldn't be that stupid[.] That would be silly[.] Lol[.]

MM sent the video to a friend of hers, who was a nurse in labor and delivery. MM told Appellant that her friend had responded by saying, "It seems kind of twitchy but the baby stays alert so I really am not sure. The repetitive motion of that leg made me think focal seizure but the rest of the baby didn't say that[.]" Appellant and MM then continued their conversation:

> [Appellant:] Ok, that's a little reassuring[.] She's been alert[.] My.lack.of.sleep speaks.to.that [sic] lol[.]

> [MM:] Haha I bet.

> [Appellant:] I'm looking for.the.peduatric clinic number[.] Your friend works at Tripler?

> [MM:] No, she works in Alabama. But she's been in L&D for 2 years[.]

> [Appellant:] Ok, that's super helpful[.] I'm a little less scared now[.]

> [MM:] Well that's good, I don't want you to be scared. But focal seizures mean that only part of the brain is affected, so the baby usually stays alert. Here is [what Johns] Hopkins['] website says[:] Simple focal seizures. The child may show different symptoms depending upon which area of the brain is involved. If the abnormal electrical brain function is in the occipital lobe (the back part of the brain that is involved with vision), the child's sight may be altered. However, more commonly, a child's muscles are affected. The seizure activity is limited to an isolated muscle group, such as fingers or to larger muscles in the arms and legs. Consciousness is not lost in this type of seizure where the seizure is localized to only one side of the brain. The child may also experience sweating, nausea, or become pale. Since you said she spit up a lot right after and started crying, [I'd] mention that when you talk to the doctor.

> [Appellant:] Ok, that makes sense[.] Thank you for your help[.]

> [MM:] Anytime. Hopefully it is nothing to worry about afterall, just always better to get checked out and be sure. Let me know if I can do anything for you guys[.]

At 1024, Appellant sent MM a follow-up message that he made an appointment for AB at 1300. After MM responded with, "Oh good! I'm glad they could get you in pretty quickly," Appellant told MM that he was "scared honestly." MM then stated, "I really think she will be okay, it is just always better to get checked out and be sure if you are concerned. And as long as today goes well[,] it should give you guys some peace of mind." Appellant responded, "I hope so,

I can't go through this again." MM responded, "Sending you a hug. I know this is scary, I really doubt it is the same situation as before. I truly believe she will be okay. It might have even just been a muscle spasm." At 1251, Appellant let MM know he was at the hospital with SrA NB and AB. The evidence is silent as to SrA NB's presence or whereabouts between 0848 and 1251 on 12 July 2017. The military judge took judicial notice that the driving distance from Appellant's residence to TAMC is between 18 and 19 miles. According to MM's testimony, it was about a 30-minute drive from Appellant's house to TAMC.

At 1345, Appellant told MM via Messenger, "They are going to bring in a neurologist. They are also concerned." He later sent her another message saying that he and SrA NB "are freaking terrified[.] Crying[.]" AB was admitted to the pediatric intensive care unit (PICU) shortly thereafter.

## D. Medical Intervention, Diagnosis, and Findings of AB's Injuries

AB's appointment at TAMC was with Captain (Capt) (Dr.) JJ, a first-year pediatric resident. When the nurse gave AB's chart to Capt JJ, the nurse said the appointment was for "feeding difficulties." Capt JJ asked if the parents had any other concerns, and the nurse said, "[N]o." Capt JJ then went to introduce herself to Appellant and SrA NB, and she witnessed AB having a seizure while in Appellant's arms, which lasted an estimated 60 seconds.[14] Capt JJ immediately notified Lt Col KD who was Capt JJ's staff supervising pediatrician at the time. Once Lt Col KD, Capt JJ, Appellant, SrA NB, and AB were all in an exam room together, Appellant and SrA NB told them that AB "had spit up after feeding and after she had spit up she started having kind of right-sided seizure like activity." Appellant showed the physicians the video he had taken of AB having the seizure. The parents also told the physicians that AB was eating less in that "she was not only taking longer to feed but feeding less frequently, two to three times a day." Capt JJ wrote in the 12 July 2017 medical record, "[The] [p]arents have had experience with seizures with their first child who was diagnosed and passed away due to HSV encephalitis at one month of age." Further, according to Lt Col KD, one of the parents (she did not remember which one) told the physicians that they were worried AB had seizure activity and they "thought that it was seizure activity because their previous child had had seizures and ultimately died of herpes."[15]

---

[14] According to medical records dated 12 July 2017, Appellant and SrA NB asked Captain (Capt) JJ "to take a look at [AB] because she was 'twitching.'"

[15] On this point, Capt JJ testified, "The mother -- when I had mentioned that I was concerned for seizures [--] the mother got very upset and had mentioned that her first child passed away due to seizures as well."

The physicians conducted an exam of AB and noted "bluish discoloration for bruising over the left eye, the left temporal area, and then the left mandibular jaw line." When Lt Col KD asked about the discoloration, Appellant told her that "he had been holding [AB] and she had – her head had fallen backwards and he had over-compensated and pushed her head into his shoulder." Lt Col KD explained that "then [Appellant] demonstrated that action of what had happened to show [her] and [Capt JJ] . . . [Appellant] [ ] stood up, [ ] like he was holding a baby and the baby's head fell back and he put in into his shoulder." Lt Col KD was told that the "accidental over-correction" described by Appellant occurred two days prior.

When asked by trial counsel if infants have the muscular strength to move their heads in such a way, Capt JJ testified that "it would be very unusual that they [would be] able to arch back and slam forward in that manner at just 10-days old."[16] Given the lack of mobility infants have, both Capt JJ and Lt Col KD were concerned AB's seizures and bruising were the result of physical abuse, or non-accidental trauma. Lt Col KD specifically testified she was "concerned for abusive head trauma." According to Capt JJ, after they obtained the history from the parents and conducted AB's physical, they notified the parents that AB needed an "urgent" computerized axial tomography scan, also known as a computed tomography (CT) scan, to assess for "bleeding or any other abnormalities causing the seizures." Lt Col KD ordered the scan which was then conducted in the clinic's radiology suite. Lt Col KD acknowledged that while she was conducting the physical, she did not consider it to be a situation where AB had to be rushed to the CT machine immediately, and AB was in stable condition when she was taken to radiology.

On the same day shortly thereafter, Major (Maj) (Dr.) JW, a pediatric radiologist at TAMC, interpreted AB's CT scans.[17] Maj JW testified AB's head CT scan was abnormal, as there "was a large amount of blood throughout the head. There was a fracture of the skull." Maj JW also stated there were "areas of 'hypoattenuation' or 'hypodensity.'" Maj JW explained that these areas "look darker. And when they look darker, you start thinking of swelling or some sort of injury to the brain in that area. The brain should look a certain way. When

---

[16] One panel member asked, "Would you say that it is completely impossible for a baby to sustain the determined injuries based off of what the father explained had [ ] happened?" Lt Col KD responded, "Yes." Another member asked Lt Col KD, "Could any type of seizure lead to the injuries, head trauma, bruising, et cetera, sustained by [AB]?" Lt Col KD responded, "No."

[17] Major (Maj) JW was dual board-certified in pediatric radiology and diagnostic radiology, and at the time of trial, testified he had reviewed 60,000 pediatric images. Maj JW was only involved in the diagnosis of AB, and not her treatment.

it starts looking darker, you start worrying about swelling." Maj JW also testi-fied that because AB's brain matter underneath the parietal bones was "hypo-dense," this was a sign of edema. From a clinical perspective, Maj JW stated, "Edema means swelling. So the brain itself was swelling in that area." This was significant because, according to Maj JW, "edema is usually the beginning, and depending on the extent, it can cause permanent damage to the brain." Maj JW stated he "identified the skull fracture of the left parietal bone," and that parietal bones are on the left and right side on the top of the head. Maj JW later testified that a parietal bone fracture is the most common type of skull fracture in infants, adding "it's very common to see those," and the pari-etal bone requires less force to fracture than other bones within the head. Later that day, a follow-up CT scan was done, indicating no change in AB's condition.

Maj JW testified that an X-ray taken of AB's chest, abdomen, and pelvis, showed AB had rib fractures. Maj JW stated, "[R]ib fractures are specific for child abuse, especially if there's no history of trauma that's provided." Maj JW further testified that magnetic resonance imaging, or MRI, of AB, taken the next day on 13 July 2017, revealed hemorrhages throughout her brain; the MRI also showed "ischemia" or that AB had a lack of blood flow to the brain.[18] Maj JW agreed the testing revealed that AB was in the early- to middle-point of brain damage.

Maj JW also testified about a skeletal survey done of AB on 20 July 2017. He said the survey revealed the left parietal bone fracture, rib fractures, and two fractures on AB's left leg, calling these leg fractures "bucket[ ]handle frac-tures." Maj JW said a bucket handle fracture "is a classic specific sign of child abuse" because it is most closely associated with "shaking." Maj JW stated that when a baby is shaken "the legs will flail about," and the metaphysis—located near the "growth plate"—"shears off from the change in acceleration from the shaking injury." Maj JW stated that putting all of this together, "the only thing [ ] that can explain all these findings is child abuse." In total, according to Maj JW, the radiographic findings concluded AB suffered multiple fractures, in-cluding the bucket handle fractures to AB's leg, rib and skull fractures, exten-sive hemorrhaging within her head, and swelling of her brain.

The Government also called as a witness Lt Col (Dr.) MH, the Deputy Chief Director of Pediatrics at TAMC, who also responded to AB's case.[19] Lt Col MH testified he was present for the CT scan and images showed she had "signifi-cant intracranial hemorrhage or bleeding in her brain." In conjunction with

---

[18] Based on Maj JW's testimony, MRIs "use magnets to create detailed images of the body and is generally the preferred test for determining damage to soft tissue."

[19] Lt Col MH was a board certified physician in pediatric critical care and general pe-diatrics.

her seizures, Lt Col MH was "very concerned" about the risk of progression of AB's injuries. Lt Col MH testified he felt they "urgently needed [to] take some action to keep [AB] safe and to try and keep any of these injuries from progressing." As a result, AB was taken to the PICU after the CT scan. After AB arrived at the PICU, Lt Col MH said AB had another seizure, briefly stopped breathing, and "there was shaking of her arms and legs." Lt Col MH responded by giving AB a breathing tube to elevate her oxygen levels and mitigate brain damage, as well as medications to stop the seizures and to reduce the bleeding and swelling in her brain. Once AB was stabilized, Lt Col MH talked to Appellant and SrA NB. Trial counsel asked Lt Col MH if Appellant said anything during this discussion. After referring to the medical records, Lt Col MH said,

> So I did note that the patient's father noted that three days prior to presentation, so three days prior to the admission, there was an incident where he was holding her and her head flopped away from him because, as you know, babies tend to do because their neck is not very strong, you know, what we call "good head control," and that he pulled her back at the time and her face had struck his shoulder.

Based on his assessment, Lt Col MH was concerned that AB was going to die due to the degree of swelling and bleeding on her brain. He also felt the pattern of injuries AB sustained "is most consistent with abusive trauma."

Lt Col (Dr.) SM testified as a child abuse expert and pediatrician for the Government.[20] Lt Col SM reviewed AB's medical records and, like the previous physicians, outlined the extent of AB's injuries, stating,

> [AB] had intracranial hemorrhaging, so subdural and subarachnoid bleeding within her skull. She had diffused swelling and ischemia to her brain; she had a skull fracture; she had soft tissue swelling and/or some bleeding into that soft tissue swelling above that skull fracture; she had multifocal bruising to her face; she had the multiple rib fractures; and she had those classical metaphyseal lesions on her left -- her femur and her tibia.

Lt Col SM also testified there was no evidence AB was suffering from infection, had no evidence of metabolic disorder, and her urine and amino acids were normal. Lt Col SM also noted that, because AB was delivered by cesarean section, the potential for trauma to the head was less than a vaginal birth, and in this case, AB did not have birth-related bruising. Lt Col SM then stated,

---

[20] Lt Col SM was a board certified physician in child abuse pediatrics (or forensic pediatrics), who had testified 75 to 100 times and been previously recognized as an expert in general pediatrics and child abuse pediatrics.

> [AB] was seen on [7 July 2017] when she was [ ]four days old, and she had no evidence of trauma at that point. And then she was seen again on the 8th when she was five days old. The 7th was a full-well exam. The 8th was more of just a quick follow-up exam. But if they had saw something on her head, they would have noted it.

Lt Col SM concluded AB's injuries were caused by trauma or "major force." Lt Col SM opined that the level of force required to cause AB's head injuries is likened to what one "would see in a car accident," or "in a major fall like [from a] second story [building] or more." She further opined that a short fall, up to five feet, would not have produced her injuries, specifically the intracranial hemorrhaging. As for whether AB's injuries were caused by "blunt force trauma," trial counsel asked Lt Col SM the following questions:

> Q [Trial Counsel]. So moving on from the intracranial hemorrhaging, what other injuries do we see? I think you mentioned a skull fracture.
>
> A [Lt Col SM]. She had a skull fracture with some soft tissue swelling, probably a little bleeding into that swelling. I call it a goose egg, a goose egg above the skull fracture.
>
> Q. What type of trauma is required to cause that?
>
> A. It's a blunt force trauma . . . . [T]he head hit something [to cause] trauma in order to produce a fracture. And that soft tissue swelling; that's a blunt force trauma.
>
> Q. And what does the soft tissue swelling tell you?
>
> A. It tells us that it's a more acute injury. Because that swelling, it doesn't always pop up immediately. It is sometimes not visible even to the parents for a day or two, and then it kind of goes away. So it's not something that's been there for a long period of time, although that's hard to say in a nine-day-old anyway, all this acute, non-acute. You know, it's really tough when you're nine days old. But it implies an acute injury.

Lt Col SM discussed the bruising around AB's left eye, stating it was likely caused by "more than one blunt trauma." She also discussed AB's rib fractures, stating "the most common way to get a rib fracture in an infant is to squeeze them: front-to-back . . . rib fractures are caused by excessive force to the baby's ribs . . . ." Finally, Lt Col SM opined that the bucket handle fractures on AB's tibia and femur were caused by child abuse, stating "these fractures are relatively common in child abuse." Lt Col SM concluded her testimony by stating AB's injuries were caused by abusive head trauma and non-accidental trauma.

When asked if Appellant's story about AB hitting his shoulder was a reasonable possibility for causing AB's injuries, Lt Col SM simply responded, "No."

### E. Post-Diagnosis and Treatment

On 13 July 2017, Appellant and SrA NB went to MM's residence. That evening, Appellant told MM that he "deleted [their] conversation from yesterday." MM testified that she felt uneasy about Appellant's comment and "kind of concerned [as to] why he was telling [her] this." MM kept the messages "because [she] felt like it was important that he had said the information about not wanting them to think he had beaten his child." After this conversation, Appellant told MM and her husband that

> he had been sitting in the recliner with AB and holding her with just his arm under her butt and when he leaned forward to get up with her, she had fallen back and he had been scared she would fall so he kind of over corrected and strongly reacted and slammed her face into his shoulder to make sure she didn't hit the ground.

Conversely, Appellant's former supervisor, Capt DC, testified that he had a telephone conversation with Appellant in April or May of 2018. According to Capt DC, Appellant said "his daughter had gone to the hospital from an incident or an accident that he had . . . . He said he was walking down the stairs holding her and tripped and fell." Based upon this testimony, trial counsel argued Appellant had given Capt DC a different explanation for AB's injuries than he had given MM and the medical providers.

### F. Charging

With respect to the Article 128, UCMJ, allegation, at the time of trial Appellant was charged with aggravated assault by intentional infliction of grievous bodily harm. The specification read as follows:

> [Appellant] [d]id, at or near the island of Oahu, Hawaii, between on or about 5 July 2017 and on or about 12 July 2017, commit an assault upon [AB] a child under the age of 16 years, by causing blunt force trauma to [AB], and did thereby intentionally inflict grievous bodily harm upon her, to wit: a skull fracture, fractured ribs, and bucket handle fractures to the left femur and tibia.

Appellant was found not guilty of this allegation, but was found guilty of the LIO of aggravated assault by a means or force likely to cause grievous bodily harm, except the words "fractured ribs, and bucket handle fractures to the left femur and tibia," for which the panel substituted the words "and brain damage."

With respect to the Article 134, UCMJ, allegation, at the time of trial, Appellant was charged with child endangerment by design resulting in grievous bodily harm. The charge read as follows:

> [Appellant] [did,] [a]t or near the island of Oahu, Hawaii, between on or about 5 July 2017 and on or about 12 July 2017, ha[ve] a duty for the care of [AB], a child under the age of 16 years, and did endanger the physical health and welfare of said [AB], by failing to obtain medical care for [AB] in a timely manner *after she was injured and had a seizure*, and that such conduct was by design and resulted in grievous bodily harm, to wit: *brain damage*, and that said conduct was of a nature to bring discredit upon the armed forces.

(Emphasis added). Appellant was found not guilty of this allegation, but was found guilty of the LIO of child endangerment by culpable negligence resulting in harm.

## II. DISCUSSION

### A. Abuse of Discretion – Admission of Evidence of GB's Seizures

#### 1. Additional information

The Defense sought to exclude all evidence relating to Appellant's first child GB via a pretrial motion in limine. In response, the Government sought to admit evidence regarding Appellant's knowledge of GB's seizures, prior to GB's death. As previously discussed, information regarding GB's seizures came from the testimony of Capt JJ and Lt Col KD, as well as AB's medical records. The Government wanted to show that because Appellant had already seen seizures in an infant, that he "knew or should have known the seriousness of what he was seeing" in AB, and thus the evidence related to AB would help to circumstantially prove knowledge and intent.[21] The Defense argued that the Government could not prove Appellant knew that AB was having the same seizures as GB simply by looking at her. The Defense also highlighted not all seizures look alike, as noted by Lt Col KD, and Appellant's conversation with MM—suggesting other possible diagnoses. The Defense, focusing on unfair prejudice under Mil. R. Evid. 403, believed Appellant knowing AB was having "the same seizure" as GB was speculative and the evidentiary value was minimally probative.

---

[21] The Government intended to limit the scope of this evidence, specifically advising the military judge that they "[did] not intend to admit any evidence about the [ ] circumstances of GB's death."

In ruling on this motion, the military judge made the following findings of fact: Appellant was "familiar with the medical symptoms experienced by GB leading to his hospitalization and untimely passing;" "[o]n the morning of 12 July 2017, [Appellant] observed and recorded AB having a seizure;" "[Appellant] sent a copy of the video to [MM] via social media messenger and asked for her thoughts;" Capt JJ noted that "[the] [p]arents have experience with seizures with their first child, who was diagnosed and passed away due to HSV encephalitis at one month of age;" and after Capt JJ observed what appeared to be a seizure, Capt JJ remembered SrA NB saying words to the effect of, "That is why we're here. Our previous child had seizures before he died of herpes encephalitis. The twitching was impacting AB's feeding . . . ." The military judge also found as fact that "[Appellant] was present when these statements were made" to Capt JJ and that "he did not say anything, act surprised, or object to what [SrA NB] said."

The military judge then ruled,

> The statements made regarding GB's history of seizures are admissible under [Mil. R. Evid.] 401. The statements are evidence of the [Appellant]'s knowledge that seizures experienced by a newborn are of great medical concern.
>
> The statements made regarding the medical history, as explained to medical providers, are not excluded under the general prohibition against hearsay. Those statements made in the presence of the [Appellant] are *adopted admissions and are not hearsay*.[22]

(Emphasis added). The military judge also found that the statements "made in [Appellant]'s presence along with those not determined to have been made in [Appellant]'s presence qualif[ied] as a hearsay exception under [Mil. R. Evid.] 803(4) as statements made for medical diagnosis or treatment." Apparently, the military judge's reference to statements made outside Appellant's presence related to statements contained in the medical records, as the military judge ruled, "Such statements were made for and were reasonably pertinent to medical diagnosis or treatment and described medical history of both [SrA NB] and [GB]."

In conducting the balancing test under Mil. R. Evid. 403, the military judge found that the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice. The military judge found that the

---

[22] The military judge raised the issue of hearsay *sua sponte*. The Defense did not object to these statements based on hearsay grounds either in their written motion or during argument on this matter.

probative value of the evidence "is high, particularly with respect to [Appellant]'s knowledge of the seriousness of seizures experienced by newborns," and was relevant to the child endangerment charge with respect to Appellant's "alleged failure to provide timely medical care."

Prior to findings argument, the military judge instructed the members that they "may consider evidence that [Appellant] may have known that his son GB experienced seizures prior to his death as the result of presumed HSV encephalitis for the limited purpose of its tendency, if any, to show [his] knowledge of the serious medical concerns associated with an infant experiencing seizures." The military judge further advised the panel, "You may not consider this evidence for any other purpose and you may not conclude from this evidence that [Appellant] is a bad person or has general criminal tendencies and that he therefore committed the offenses charged."

Appellant now argues the military judge abused his discretion by allowing the Government to introduce SrA NB's hearsay statements for at least three reasons: (1) finding that Appellant "was aware of GB's medical symptoms," despite the lack of evidence that Appellant was aware of GB's medical symptoms; (2) "[Appellant]'s silence did not evince an unequivocal adoption or acquiesce to SrA NB's statement regarding GB seizures" under Mil. R. Evid. 801(d)(2)(B); and, (3) although "SrA NB's discussion of GB's seizures outside [Appellant]'s presence may qualify as an exception to hearsay for the purposes of medical diagnosis[,] the military judge erroneously imparted her knowledge onto [Appellant]," under Mil. R. Evid. 803(4), as Appellant "did not evince his knowledge regarding GB['s] seizures." Appellant did not object to the statements under hearsay grounds at the time of trial, but rather focused on whether the evidence was admissible under Mil. R. Evid. 403. The Government contends Appellant forfeited this issue, absent plain error, because he failed to preserve the objection on the basis of hearsay.

### 2. Law

We review a military judge's decision to admit or exclude evidence for an abuse of discretion. *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. 'The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous.'" *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010) (quoting *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000)) (citations omitted). A decision to admit or exclude evidence based upon Mil. R. Evid. 403 is within the sound discretion of the military judge. *United States v. Smith*, 52 M.J. 337, 344 (C.A.A.F. 2000). "A military judge enjoys 'wide discretion' in applying Mil. R. Evid. 403" and "when a military judge conducts a proper balancing test under Mil. R. Evid. 403, the ruling

will not be overturned unless there is a 'clear abuse of discretion.'" *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000) (citations omitted).

To preserve a claim of error in a ruling to admit evidence, a party must "state[ ] the specific ground, unless it was apparent from the context." Mil. R. Evid. 103(a)(1)(2). "A party is required to provide sufficient argument to make known to the military judge the basis of his objection and, where necessary to support an informed ruling, the theory behind the objection." *United States v. Datz*, 61 M.J. 37, 42 (C.A.A.F. 2005) (first citing *United States v. Banker*, 60 M.J. 216 (C.A.A.F. 2004); and then citing *United States v. Brandell*, 35 M.J. 369, 372 (C.M.A. 1992)). "Where an appellant has not preserved an objection to evidence by making a timely objection, that error will be forfeited in the absence of plain error." *United States v. Brooks*, 64 M.J. 325, 328 (C.A.A.F. 2007) (citing Mil. R. Evid. 103(d)). Under plain error review, the appellant has the burden of showing there was error, that the error was plain or obvious, and that the error materially prejudiced a substantial right of the appellant. *United States v. Girouard*, 70 M.J. 5, 11 (C.A.A.F. 2011).

Under "Mil. R. Evid. 801(d)(2)(B), a statement is excepted from the general hearsay rule when it is one that has been offered against a party who has manifested an adoption or belief in its truth. An adoptive admission can be accomplished through nonverbal means, such as a hand or head motion." *Datz*, 61 M.J. at 43. "When a statement is offered as an adoptive admission, the proponent must present sufficient proof to support a finding that the party against whom the statement is offered heard, understood, and acquiesced in the statement." *Id.* "[T]he foundational requirements for admitting adoptive admissions [require] a showing that (1) the party against whom it is offered was present during the making of the statement; (2) he understood its content; and (3) his actions or words or both unequivocally acknowledged the statement in adopting it as his own." *Id.* (citation omitted).

### 3. Analysis

#### a. Mil. R. Evid 803(4) – Statements Made for Medical Diagnosis

Regarding the medical records exception to hearsay, we find Appellant has failed to demonstrate the military judge committed plain error in finding the statements contained in the medical records were admissible as exceptions to hearsay. The statements fit squarely within Mil. R. Evid. 803(4) because they were made for the purpose of medical diagnosis or treatment.

#### b. Mil. R. Evid. 801(d)(2)(B) – Adopted Admissions

The more pertinent issue is whether the military judge committed plain error in finding that Appellant, through his silence, adopted SrA NB's admissions, under the standard set out in *Datz*. We find he did not. The military judge found as fact that Appellant was familiar with the medical symptoms

experienced by his first child GB, which would have included seizures; that Appellant recorded AB having a seizure; that he attended AB's medical appointment; and that he was present when SrA NB made the statements. Recognizing that "merely hearing the statement of a third person does not equate to adoption by silence," *United States v. Stanley*, 21 M.J. 249, 250 (C.M.A. 1986), we find that under the circumstances of this case, a dissent or objection to SrA NB's statements would have been reasonably expected if her comments had not been correct. *See id*. On appeal, Appellant even concedes in his assignment of errors brief to this court that he would have "had no reason to doubt the veracity of his wife's claims during the discussions with Capt JJ and Lt Col KD. Presumably, a mother would not lie to medical personnel when seeking care for her child." If the first time Appellant heard GB had seizures before he died was when SrA NB voiced this information to AB's physicians, Appellant's surprise would be noticed, and it was not. Although Appellant argues on appeal that he "had no reason to doubt the potential truth of his wife's statement[s] nor dissent even if he believed she could be mistaken," in light of the circumstances and the weight of the situation, his lack of response indicates that he did acquiesce to the content of SrA NB's statements. In so acquiescing, Appellant adopted those statements as his own, rendering them non-hearsay under Mil. R. Evid. 801(d)(2)(B).

### c. Mil. R. Evid. 403

We find the military judge did not commit plain error in finding SrA NB's statements were not hearsay or in excluding the admission of SrA NB's statements under Mil. R. Evid. 803(4). However, like all evidence, the statements were subject to the balancing test of Mil. R. Evid. 403 and Appellant objected to this evidence on these grounds. When a military judge articulates his properly conducted Mil. R. Evid. 403 balancing test on the record, his decision will not be overturned absent a clear abuse of discretion.

There is little question that the evidence was in fact relevant. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Mil. R. Evid. 401. As the military judge stated, Appellant's "knowledge that seizures experienced by a newborn are of great concern," and the fact that Appellant previously had a child who suffered seizures, and ultimately passed away, makes the fact that he brought a second child to the hospital, who was also having seizures, all the more relevant. While there was no direct evidence that Appellant specifically knew GB had seizures, SrA NB asserted that the child she shared with Appellant did, in fact, have seizures. This circumstantial evidence makes the inference Appellant was aware of GB's seizures all the more plausible and therefore legally relevant under Mil. R. Evid. 401.

Appellant's trial defense counsel raised timely objections on the basis of relevance and argued the probative weight of the evidence was substantially outweighed by unfair prejudice to Appellant and should be excluded under Mil. R. Evid. 403. Trial counsel addressed unfair prejudice, noting the question is "whether this evidence is going to overwhelm the emotion response of the members in such a way their logical and deliberate reasoning are going to go out of the window." We agree: the most logical concern is whether members would question whether GB's death was anything but natural, and if so, how that would affect their findings. Yet, we give deference to the military judge's ruling in this case since he conducted his balancing on the record, so our analysis does not focus on whether we would find the probative value was substantially outweighed, but whether the military judge's ruling was a clear abuse of discretion. We find that it was not. The value of the circumstantial evidence was not insubstantial. In this case, knowledge of seizures was perhaps the most critical issue regarding the child endangerment allegation; the military judge's decision to admit SrA NB's statements, and that Appellant circumstantially knew GB had seizures under Mil. R. Evid. 403, was clearly within his reasonable discretion. Finally, the military judge provided a limiting instruction on how the panel members were to view this evidence. Members are presumed to follow the military judge's instructions, *see United States v. Loving*, 41 M.J. 213, 235 (C.A.A.F. 1994); *United States v. Holt*, 33 M.J. 400, 408 (C.M.A. 1991), and there is nothing to indicate they did anything but. We find the military judge did not abuse his discretion on this issue.

## B. Exceptions and Substitutions Made by the Panel

### 1. Additional Background

Appellant argues that the panel's exceptions and substitutions regarding the aggravated assault specification represent a fatal variance. As previously noted, Appellant was charged with intentionally inflicting grievous bodily harm, to wit: "a skull fracture, fractured ribs, and bucket handle fractures to the left femur and tibia." Appellant was ultimately convicted by exceptions and substitutions of the LIO of aggravated assault by means or force likely to cause grievous bodily harm, with the panel excepting the words "fractured ribs, and bucket handle fractures to the left femur and tibia," and substituting the words "and brain damage."

The issue of a variance instruction came up during the discussion of the draft instructions before the members heard closing arguments. The Government presented two different findings worksheet options—one with exceptions and substitutions instructions and one without; the military judge chose the latter. Neither party requested the variance instruction and the military judge did not provide the members an instruction on variance, opining he was "not convinced that it [was] necessary."

After they had already begun deliberations, the members asked for clarification on the definitions "to wit" and "that is." On the latter, the panel president stated, "we are trying to specify that it's 'all,' 'none,' or 'some' of the injuries." The military judge advised the members that "to wit" (as related to Charge I) is "essentially, an overly-legalistic way of stating something along the lines of 'namely' or 'specifically.' If you insert the word 'namely,' instead of where 'to wit' would be, that's essentially what it means." As for "that is" (as related to Charge II), the military judge advised the members that "that is" was another way of saying "to wit."

The military judge then instructed the members,

> If you have doubt about the injuries described in the specification, but you are satisfied beyond a reasonable doubt that the offense or a lesser included offense was committed in a particular manner or involved those injuries that differs slightly from the exact injuries in the specification, you may make minor modifications in reaching your findings by changing the nature of the injuries described in the specification provided that you do not change the nature, or identity of the offense, or the lesser included offense.

> So, as to the Specification of Charge II, if you have doubt that the accused inflicted grievous bodily harm, that is a skull fracture, fractured ribs and bucket handle fractures to the left femur and tibia, you may still reach a finding of guilty so long as all the elements of the offense or a lesser included offense are proved beyond a reasonable doubt, but you must modify the specification to correctly reflect your findings.

Although the military judge did not ask either party if they objected to the instruction, neither side did. The Defense did not object to or raise any concerns about the panel's findings by exceptions or substitutions at trial.

### 2. Law

Material variance is a question of law reviewed de novo. *United States v. Treat*, 73 M.J. 331, 335 (C.A.A.F. 2014) (citations omitted). Rule for Courts-Martial 918(a)(1)(c) authorizes variance in findings by exceptions and substitutions. However, "exceptions and substitutions may not be used to substantially change the nature of the offense or to increase the seriousness of the offense or the maximum punishment for it." *Id.*

To prevail on a fatal variance claim, an appellant must show that the variance was (1) material and (2) that it substantially prejudiced him. *United States v. Finch*, 64 M.J. 118, 121 (C.A.A.F. 2006) (citation omitted). "A variance that is 'material' is one that, for instance, substantially changes the nature of

the offense, increases the seriousness of the offense, or increases the punishment of the offense." *Id.* (citing *United States v. Teffeau*, 58 M.J. 62, 66 (C.A.A.F. 2003)). "A variance can prejudice an appellant by (1) putting 'him at risk of another prosecution for the same conduct,' (2) misleading him 'to the extent that he has been unable adequately to prepare for trial,' or (3) denying him 'the opportunity to defend against the charge.'" *Treat*, 73 M.J. at 336 (citations omitted).

When trial defense counsel fail to object, this court reviews findings by exceptions and substitutions for plain error. *Finch*, 64 M.J. at 121. The plain error test requires that (1) there was an error; (2) the error was plain, clear or obvious; and (3) the error affected substantial rights. *Id.*

### 3. Analysis

We do not find plain error on this issue. First, the military judge correctly advised the members of their ability to modify findings. *See Treat*, 73 M.J. at 335 (holding a court-martial is explicitly authorized to make findings by exceptions and substitutions under R.C.M. 918(a)(i)). Second, the variances were not so material as to amount to plain error. Third, Appellant was not misled because Appellant was provided notice of what he was defending against. Although Appellant believes "brain damage" renders the charge more serious (as common sense would dictate that damage to the brain may not heal, whereas broken bones generally heal), the panel found these broken bones were not grievous bodily harm. In turn, the panel limited the scope of AB's injuries to her skull and brain, and rejected the Government's more expansive charging of the alleged injuries. Also, as part of the child endangerment offense, Appellant knew AB's "brain damage" would be an issue at trial, and evidence would be introduced regarding AB's brain damage. As such, he was able to adequately prepare his defense.

Finally, the members found Appellant not guilty of the excepted language, so he now is "fully protected against another prosecution for the same offense." The variance in this case did not substantially change the nature of the offense, increase the seriousness of the offense, or increase the punishment of the offense for which Appellant was convicted. We do not find the variance to be material. Even if we had found the variance to be material, we would not find Appellant was prejudiced by the variance.

## C. Legal and Factual Sufficiency

### 1. Additional Background

Appellant makes three arguments to support his claim that his aggravated assault conviction is legally and factually insufficient. First, he argues the Government "failed to prove that AB's brain damage was caused by blunt force trauma." Second, "contrary to the Government's contentions, [Appellant's]

statements and conduct were not inculpatory." Finally, Appellant "was not [the] only person with exclusive custody over AB on 10 July 2017," in that SrA NB could have abused AB.

Appellant makes four arguments to support his claim that his child endangerment conviction is legally and factually insufficient. First, Appellant argues that he "could not have known AB was experiencing a seizure when trained medical professionals were similarly unable to definitively diagnose her." Furthermore, "he could not have known that scheduling a medical appointment four hours after [AB's] apparent seizure subjected her to a reasonable probability of harm when these professionals did not advise him to seek immediate treatment." Second, Appellant argues "the fact that GB experienced seizures fails to demonstrate [Appellant] understood the potential severity or seriousness of AB's condition." Third, the Government failed to show AB's brain was damaged in the four-hour interval between her "apparent seizure" and AB's medical appointment. Finally, "assuming arguendo that [Appellant] was alternatively liable for obtaining medical care for AB after she was injured but prior to her seizure, the Government failed to offer sufficient proof demonstrating when AB was injured and whether she exhibited any significant symptoms."

**2. Law**

We review issues of legal and factual sufficiency de novo. Article 66(d), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018)). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (internal quotation marks and citation omitted).

"[T]he [G]overnment is free to meet its burden of proof with circumstantial evidence." *Id.* (citations omitted). This includes using circumstantial evidence

to prove an accused's knowledge. *See United States v. Curtin*, 9 U.S.C.M.A. 427, 432 (C.M.A. 1958).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

Appellant was convicted of aggravated assault by the means or force likely to cause grievous bodily harm, in violation of Article 128, UCMJ. The Government was required to prove five elements beyond a reasonable doubt: (1) that Appellant did bodily harm to AB, to wit: a skull fracture and brain damage; (2) that Appellant did so by causing blunt force trauma to AB; (3) that the bodily harm was done with unlawful force or violence; (4) that the means or force was used in a manner likely to produce death or grievous bodily harm, to wit: blunt force trauma; and (5) that at the time of the assault, AB was a child under the age of 16 years. *See Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*), pt. IV, ¶ 54.b.(4)(a).

"The phrase 'other means or force' may include any means or instrumentality not normally considered a weapon." 2016 *MCM*, pt. IV, ¶ 54.c.(4)(a)(ii). A means or force is used in a manner "likely'" to produce death or grievous bodily harm "when the natural and probable consequence of its particular use would be death or grievous bodily harm." *Id*. "'Grievous bodily harm' means serious bodily injury. It does not include minor injuries, such as a black eye or a bloody nose, but does mean fractured or dislocated bones, deep cuts, torn members of the body, serious damage to internal organs, or other serious bodily injuries." *See* 2016 *MCM*, pt. IV, ¶ 54.c.(4)(a)(iii).

Appellant was also convicted of child endangerment by culpable negligence resulting in harm, in violation of Article 134, UCMJ. The Government was required to prove five elements beyond a reasonable doubt: (1) that Appellant had a duty for the care of AB; (2) that AB was then under the age of 16 years; (3) that Appellant endangered AB's physical health and welfare through culpable negligence, to wit: "by failing to obtain medical care for [AB] in a timely manner after she was injured and had a seizure;" (4) that Appellant's conduct resulted in harm to AB, to wit: brain damage; and (5) that under the circumstances, Appellant's conduct was of a nature to bring discredit upon the armed forces. *See* 2016 *MCM*, pt. IV, ¶ 68a.b.

"Culpable negligence is a degree of carelessness greater than simple negligence . . . . [and] may include acts that, when viewed in the light of human experience, might foreseeably result in harm to a child, even though such harm would not necessarily be the natural and probable consequences of such acts." 2016 *MCM*, pt. IV, ¶ 68a.c.(3). Further,

> [T]he age and maturity of the child, the conditions surrounding the neglectful conduct, the proximity of assistance available, the nature of the environment in which the child may have been left, the provisions made for care of the child, and the location of the parent or adult responsible for the child relative to the location of the child, among others, may be considered in determining whether the conduct constituted culpable negligence.

*Id.* In determining whether the consequences of an act are foreseeable, we use an objective test. *United States v. Oxendine*, 55 M.J. 323, 325 (C.A.A.F. 2001). "The test for foreseeability is whether a reasonable person, in view of all the circumstances, would have realized the substantial and unjustifiable danger created by his acts." *Id.* (citation omitted).

With respect to "harm," "[a]ctual physical or mental harm to the child is not required. The offense requires that the accused's actions reasonably could have caused physical or mental harm or suffering. However, if the accused's conduct does cause actual physical or mental harm, the potential maximum punishment increases." 2016 *MCM*, pt. IV, ¶ 68a.c.(4).

"Duty of care is determined by the totality of the circumstances and may be established by statute, regulation, legal parent-child relationship, mutual agreement, or assumption of control or custody by affirmative act. When there is no duty of care of a child, there is no offense under this paragraph." 2016 *MCM*, pt. IV, ¶ 68a.c.(7).

Child endangerment by culpable negligence is a LIO of child endangerment by culpable negligence resulting in harm. "The Constitution requires that an accused be on notice as to the offense that must be defended against, and that only lesser included offenses that meet these notice requirements may be affirmed by an appellate court." *United States v. Jones*, 68 M.J. 465, 468 (C.A.A.F. 2010) (citations omitted). "The importance of defining LIOs in this context cannot be understated, as an accused may be convicted of uncharged LIOs precisely because they are deemed to have notice [citation omitted], and military judges must instruct the members on LIOs reasonably raised by the evidence." *Id.* (citation omitted).

**3. Analysis**

*a. Aggravated Assault*

In viewing the evidence in the light most favorable to the Government, we conclude the evidence supports Appellant's conviction for aggravated assault by the means or force likely to cause grievous bodily harm to AB, and that the specification of Charge II is legally and factually sufficient.

Despite Appellant's contention that the Government failed to prove that AB's brain damage was caused by blunt force trauma, collectively the evidence provided by all the medical professionals who testified overwhelmingly contradicts this assertion. Based on Lt Col SM's testimony, and the evidence that AB did have a skull fracture, we find that a panel could reasonably infer AB's skull fracture was the result of blunt force, which caused AB to suffer seizures even after she arrived at the hospital, as well as bleeding in her brain. AB was also suffering from edema or brain swelling. At one point, she stopped breathing. Lt Col MH opined that AB was at "imminent risk for death" and that AB's injuries were "most consistent with abusive trauma." Brain damage was obviously a concern, and in fact, did occur, according to Maj JW. While there was no direct evidence, there was plenty of circumstantial evidence from which the members could conclude how AB's injuries occurred, especially in light of the common human experience that nine-day-old babies typically do not have a variety of broken bones. We are satisfied the Government proved that AB's injuries were the result of non-accidental trauma, that Appellant assaulted AB in a manner likely to produce death or grievous bodily harm, and that AB's skull fracture and brain damage were caused by the use of blunt force.

As for the inculpatory nature of Appellant's statements, we highlight the following: (1) his claim that he "over-corrected" and slammed AB into his shoulder; (2) the deleted text conversation with his wife on 10 July 2017; (3) his statement to MM that he deleted their Facebook Messenger conversation, one day after the communication; (4) his statement to MM that he did not want medical providers "thinking [he] beat [his] child;" and (5) his statement to Capt DC that AB's injuries occurred after Appellant fell down the stairs holding AB. When looking at this case as a whole, the totality of the circumstances indicate that these statements were inculpatory and provided the panel information to conclude what happened between 8 July 2017 and 12 July 2017. From these statements, one could reasonably infer that Appellant sought to minimize his actions and the injuries he caused to AB, and when it became clear that the gravity of AB's injuries were worse than his explanation—that he merely slammed her into his shoulder—he tried to hide his explanation by deleting his messages.

Further, part of Appellant's argument is that no government witness was able to "conclusively identify when AB was hurt." That may be true if one is looking for a specific time or event. But, the evidence does show that prior to 8 July 2017, AB was a healthy, baby girl; on 9 July 2017, she appeared to have no injuries on her face; and on 11 July 2017, her face was injured and she was having issues eating. While we do not know specifically when AB was harmed, a reasonable factfinder could conclude, from the evidence, it was during this fairly narrow window.

Finally, we find that Appellant's argument SrA NB harmed AB is not persuasive and that a reasonable factfinder could dismiss it as such. Appellant points us back to 10 July 2017 after SrA NB returned home, where she agreed to watch AB so Appellant could rake the lawn and "[s]et up the grill." Appellant argues that SrA NB had access and *could have abused* AB. Appellant also notes that it was Appellant who recorded AB, sent the video to a nurse (MM) for advice, and set up the appointment for AB; whereas, SrA NB did nothing—"the sort of conduct one might engage in if trying to avoid detection." While the evidence is silent on what SrA NB was doing the morning of 12 July 2017, we need not speculate on SrA NB's role, as the evidence shows a reasonable factfinder could conclude Appellant harmed AB.

We conclude that a rational factfinder could have found beyond a reasonable doubt all the essential elements of aggravated assault by a means or force likely to cause grievous bodily harm. Furthermore, in assessing factual sufficiency, after weighing all the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. Therefore, we find Appellant's conviction for aggravated assault by a means or force likely to cause grievous bodily harm to AB both legally and factually sufficient.

### b. Child Endangerment

For the following reasons, although we find Appellant's conviction of child endangerment by culpable negligence resulting in harm to AB to be legally sufficient, we are not personally convinced that Appellant's culpable negligence resulted in harm to AB and find the specification factually insufficient. However, we find the evidence is legally and factually sufficient to support a conviction of the LIO of child endangerment by culpable negligence.

As we evaluate the Specification of Charge I, child endangerment, the key words in the allegation are that Appellant failed to obtain medical care for AB in a timely manner "*after she was injured and had a seizure*" and "that such conduct was by design and *resulted in grievous bodily harm*, to wit: brain damage." (Emphasis added). We first will focus on the latter, that is, the timing of when AB suffered brain damage.

We begin by considering the ramifications of the panel's findings to the aggravated assault specification. As a result of their exceptions and substitutions, the panel found Appellant guilty of the following allegation:

> In that [Appellant], . . . did, at or near the island of Oahu, Hawaii, between on or about 5 July 2017 and on or about 12 July 2017, commit an assault upon [AB] a child under the age of 16 years, by causing blunt force trauma to [AB], and did [by a means or force likely to] cause grievous bodily harm upon her, to wit: a skull fracture and brain damage.

The panel found that after Appellant assaulted AB, he caused grievous bodily harm upon AB, in part, brain damage. This was a significant substitution as it relates to the child endangerment specification. When the panel specifically found that AB was already suffering brain damage when she was seizing on the morning of 12 July 2017, it created an issue as to whether the Government provided evidence that AB suffered *additional* brain damage during Appellant's four-hour delay in obtaining medical care relating to the child endangerment conviction. In other words, distinct from the aggravated assault harm, the Government was required to prove Appellant's delay in obtaining medical attention for AB resulted in actual harm as the panel found.

Appellant was charged with the gravamen offense of child endangerment by design, resulting in grievous bodily harm to AB, but the panel found Appellant guilty of the LIO of child endangerment by culpable negligence *resulting in harm*. We find that the evidence does not support this finding, but instead find that Appellant is guilty of another LIO of child endangerment, that being, child endangerment by culpable negligence.

Lt Col SM testified, "[AB] was not normal after this head injury. She was not behaving normal. She was not eating normal. So you could look at symptoms that are consistent with head injury to possibly suggest that the injury occurred in proximity to the onset of symptoms." Lt Col SM was asked, "Is it fair to say you are not really able to provide anything more than a fairly wide range as to when these injuries could have occurred?" Lt Col SM responded that AB's head injury "occurred before she became symptomatic in close proximity to her symptoms given the degree -- this was a significant head trauma. This wasn't a mild head injury. She was not normal after her head injury. So you can time her head injury . . . ."

Lt Col SM's testimony suggested that AB's brain injury occurred before her seizures on 12 July 2017. Granted, we know that after Appellant went to the hospital, AB continued to have seizures, at one point stopped breathing, had a breathing tube inserted into her body to provide more oxygen to the brain to

hopefully mitigate additional brain damage, and was given medications to reduce the swelling in her brain. It would seem that AB's condition substantially worsened after she arrived at the hospital and it is reasonable to assume that had treatment been administered more quickly, some of these events may not have occurred. Viewing the evidence in the light most favorable to the Prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, as the members did have evidence that swelling can continue up to 72 hours after trauma. If the members believed AB's brain was still swelling during the morning of the trip to the hospital, then the members could find guilt beyond a reasonable doubt.

However, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we ourselves are not convinced of Appellant's guilt as to actual harm beyond a reasonable doubt. The court acknowledges there was no sense of urgency, nor was there a sense of urgency when AB first arrived at the clinic. While Lt Col KD and Capt JJ wanted to conduct more analyses, neither seemed to perceive a crisis, which is pertinent to Appellant's argument that if medical providers did not perceive a crisis, it was reasonable for him not to perceive a crisis. It was only after Lt Col MH saw the results of AB's tests did a sense of urgency come over the staff and they began to fear that AB might die from her injuries. We are not convinced the Government proved additional damage actually (or even likely) occurred during the four-hour window in which Appellant failed to obtain medical care, and therefore, we find the specification as it relates to "resulting in harm" factually insufficient.[23]

Nonetheless, the question is whether the evidence supports the LIO of child endangerment by culpable negligence, a LIO which was available to the panel and to which they were advised. The elements of this offense are: (1) that Appellant was responsible for the care of AB; (2) that AB was under the age of 16 years; (3) that Appellant did endanger the physical health and welfare of AB

---

[23] We also note that in pretrial motions, after arraignment, the Government sought to amend the charge sheet to have the words "*after she was injured and had a seizure*" deleted, arguing that these words were "unnecessary surplusage" and that the deletion was "intended to simply bring the specification in line with the charged timeframe." The Defense disagreed, arguing the deletion was a major change and the "Prosecution [was seeking] to change the crux of the crime." The military judge denied the Government's request. In making this motion, it is apparent that the Government was trying to shift Appellant's culpability from 12 July 2017 (after the seizure was reported) to 10 July 2017, when the Government believed Appellant injured AB. Arguably, the Government recognized that by charging "after she was injured and had a seizure," the window for finding Appellant guilty of the child endangerment offense was significantly reduced. In other words, instead of having a two-day charging window, they had approximately a four-hour window.

by failing to obtain medical care for AB in a timely manner; (4) that such conduct constituted culpable negligence; and (5) that, under the circumstances, the conduct of the accused was of a nature to bring discredit upon the armed forces. *See* 2016 *MCM*, pt. IV, ¶ 68a.f.(3). The only difference between this LIO and the one of which Appellant was convicted is that this LIO does not require actual physical or mental harm to AB. It only requires that Appellant's conduct reasonably could have caused physical harm, mental harm, or suffering. To this LIO, we find the evidence supports a finding of guilty.

The Government's window to prove culpable negligence was only about four hours, from 0848 when Appellant took the video of AB seizing until approximately 1300, when the appointment was scheduled. Thus, the question for the members was whether taking nearly four hours to go to the hospital for a scheduled appointment (or taking any appropriate action for that matter, such as calling for an ambulance), and not immediately taking AB to an emergency room (or such) when AB was seizing at 0848, was a failure to obtain medical care in a *timely manner*. We believe it was a failure on the part of Appellant. First, Appellant argues that he could not have known AB was experiencing a seizure when MM (and her nurse friend) were unable to "definitely diagnose" AB and that this establishes that he "had no reason to believe he might foreseeably harm AB by failing to rush her to hospital." This is not a credible argument. A nine-day-old baby having seizures would have caused any reasonable parent to be concerned about their child's welfare, and Appellant was clearly concerned enough about AB's seizure to send a video to MM, a registered nurse; he also had another child who experienced seizures and died soon thereafter. In the alternative, in what could be construed as a casual back-and-forth conversation over a social media platform in some sort of attempt at self-diagnosis, Appellant may have been attempting to buy time in hopes that AB would recover from her injuries, or Appellant was hoping MM would say something along the lines of, "it's not a big deal." Regardless, we are convinced Appellant's waiting for close to 40 minutes for MM to respond, along with the timeframe of their conversation, is evidence of culpable negligence itself.

Appellant hones in on the facts that MM did not instruct him to immediately take AB to an emergency room or call 9-1-1, that she recommended he talk to a doctor, and that she said AB's seizure "might have even been a muscle spasm." Yet, reading MM's comments indicate she *was* concerned for AB, going so far as to reach out to another medical provider for an assessment and telling Appellant, "*I don't want to scare you or anything, I've never seen a newborn move like that.*" (Emphasis added). Also, MM's nurse friend thought AB was having a focal seizure; MM then advised Appellant again, "I don't want you to be scared. But focal seizures meant that only part of *the brain is affected*, so the baby usually stays alert . . . ." (Emphasis added). It is not unreasonable to

believe telling someone that "the brain is affected" would be enough justification for most people to take immediate action.

Additionally, and perhaps most importantly, Appellant fails to acknowledge that *MM was making her assessment based solely on the video*, and not the totality of the actual situation. MM's medical advice may have been, and probably would have been, significantly different if Appellant had provided a more truthful account of AB's injuries. Instead, Appellant downplayed AB's injuries, focusing on reflux and loss of appetite. Appellant's explanation that "[AB] swung her head back…and when [he] caught it, [he] overcorrected and bruised her face," may have been true in some sense, but the evidence was conclusive that this action would not have caused AB's significant injuries. Also, the fact that he waited for nearly 40 minutes to get a response from MM, on Facebook Messenger, and apparently took no other recourse or action to get help (other than schedule an appointment well after the seizing), along with his own words that he "d[i]dn't want them thinking [he] beat [his] child," is quite telling of Appellant's consciousness of guilt while this tragedy was unfolding.

Second, Appellant attacks the evidence related to his first child GB, claiming it does not necessarily mean Appellant understood the severity or seriousness of AB's condition just because GB experienced seizures. We disagree. Recognizing the Government did not provide more details about the type, number, "physical manifestations," length, et cetera, of the seizures GB experienced, the fact that Appellant and SrA NB previously had a child who experienced seizures and passed away, is not something that can be ignored. When SrA NB told Capt JJ (with Appellant present), "that [their] first child passed away due to seizures as well," Appellant never contradicted or corrected this statement. While it is certainly tragic that Appellant had to live through the death of one child who had seizures, we conclude that a reasonable person in Appellant's position would have been more cognizant of something being seriously wrong when his newborn baby was also experiencing seizures only a year later.

Third, while we agree with Appellant that the Government failed to show AB's brain was actually damaged or harmed during the four-hour window, the record shows that Appellant's delay in seeking medical care for AB reasonably *could* have exacerbated AB's brain damage. Once AB's doctors fully understood her test results, the record shows that time was of the essence in trying to prevent AB's brain damage from worsening, and her possible death. AB continued to have seizures even after arriving at the hospital. Her brain was bleeding and her injuries led to an edema or brain swelling. At one point, she stopped breathing. Lt Col MH opined that AB was at "imminent risk for death." Brain damage was obviously a concern, and in fact, had occurred, according to Maj JW.

When viewed in the light of human experience, it was foreseeable that by waiting over three hours to go to the hospital constituted child endangerment by culpable negligence. However, it was even more foreseeable given Appellant's history with seizures and infants. The totality of the circumstances show that Appellant was responsible for the care of AB in ensuring AB received medical treatment once she began seizing at 0849 on 12 July 2017. We conclude that a rational factfinder could have found beyond a reasonable doubt all the essential elements of the LIO of child endangerment by culpable negligence. In assessing factual sufficiency, after weighing all the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt of the LIO of child endangerment by culpable negligence. We find a conviction for the LIO of child endangerment by culpable negligence to be legally and factually sufficient.

**D. Convening Authority Decision on Action**

**1. Additional Background**

Appellant's court-martial adjourned on 19 February 2020, when the sentence hearing concluded. On 28 February 2020, Appellant's trial defense counsel submitted Appellant's clemency request, wherein Appellant asked the convening authority "for relief regarding [his] reduction in rank;"[24] Appellant also submitted a request for deferment of reduction in grade until action and a request to waive automatic forfeitures for the benefit of AB.

On 6 March 2020, the convening authority signed a Decision on Action memorandum. In that memorandum, the convening authority took no action on the findings in this case. The convening authority suspended the adjudged forfeitures[25] and waived automatic forfeitures for the benefit of AB, both for a period of six months. The convening authority did not approve or disapprove the remainder of Appellant's adjudged sentence, including Appellant's re-

---

[24] In his clemency matters, Appellant did not specifically state what relief he was requesting regarding his reduction in rank.

[25] With respect to the suspension of the adjudged forfeitures, the decision on action memorandum and the entry of judgment (EoJ) state,

> The first six months of the adjudged forfeitures of total pay and allowances is suspended for six months from the [EoJ], at which time, unless the suspension is sooner vacated, the suspended forfeitures will be remitted without further action. The collection of the remaining forfeiture of total pay and allowances will begin at the end of the period of suspension, or sooner if the suspension is vacated.

32

quested deferment of the adjudged reduction in rank and the dishonorable discharge. He also stated, "Before taking action in this case, I considered matters timely submitted by the accused under Rule[ ] for Courts-Martial [ ] 1106."

On 10 March 2020, in a separate document, the convening authority formally denied Appellant's requested deferment of the adjudged reduction in rank. The entry of judgment noted Appellant requested deferment of the adjudged reduction in grade and the convening authority's denial of Appellant's request.

### 2. Law and Analysis

At the time the convening authority signed the Decision on Action memorandum in this case, Air Force Instruction (AFI) 51-201, *Administration of Military Justice*, Section 13D (18 Jan. 2019), advised convening authorities to apply the version of Article 60, UCMJ, 10 U.S.C. § 860, in effect at the time of the earliest offense.[26] At the same time, the instruction equated a convening authority's decision to take "no action" with granting no clemency relief, explaining:

> A decision to take action is tantamount to granting relief, whereas a decision to take no action is tantamount to granting no relief. Granting post-sentencing relief (i.e. "taking action") is a matter of command prerogative entirely within the discretion of the convening authority, as limited by the applicable version of Article 60, UCMJ.

AFI 51-201, ¶ 13.17.1.

During the pendency of this appeal, the United States Court of Appeals for the Armed Forces (CAAF) decided *United States v. Brubaker-Escobar*, 81 M.J. 471, 472 (C.A.A.F. 2021) (per curiam), holding:

> [I]n any court-martial where an accused is found guilty of at least one specification involving an offense that was committed before January 1, 2019, a convening authority errs if he fails to take one of the following post-trial actions: approve, disapprove, commute, or suspend the sentence of the court-martial in whole or in part.

In *Brubaker-Escobar*, the CAAF found the convening authority's failure to explicitly take one of those actions was a "procedural error." *Id*. at 475. The

---

[26] Specifically, AFI 51-201, ¶ 13.16 stated: "To determine the applicable version of Article 60, look at the date of the earliest offense resulting in a conviction. The version of Article 60 in effect on that date applies to the entire case."

court noted: "Pursuant to Article 59(a), UCMJ, 10 U.S.C. § 859(a) (2018), procedural errors are 'test[ed] for material prejudice to a substantial right to determine whether relief is warranted.'" *Id.* (alteration in original) (quoting *United States v. Alexander,* 61 M.J. 266, 269 (C.A.A.F. 2005)). The court held the convening authority's error in taking "no action" was harmless because the appellant did not request clemency and the convening authority could not have granted meaningful clemency regarding any portion of the adjudged sentence. *Id.*

In this case, the convening authority made a procedural error when he did not take action on all portions of the sentence. In testing for prejudice, we have examined the convening authority's Decision on Action memorandum and the convening authority's subsequent 10 March 2020 memorandum denying Appellant's deferment of reduction in rank. Although the convening authority was powerless to grant clemency on the findings and the confinement and discharge portions of the adjudged sentence, he was empowered to grant clemency on Appellant's forfeitures and reduction in rank. *See* Articles 60(c)(3)(A)–(4)(A), UCMJ, 10 U.S.C. §§ 860(c)(3)(A)–(4)(A) (2016 *MCM*). Appellant submitted a thorough clemency request outlining the reasons for his request—matters the convening authority stated he considered, and with respect to the forfeitures, did grant relief. Further, the convening authority did formally deny Appellant's request for the deferment in the reduction of rank. While this action should have occurred in the convening authority's Decision on Action memorandum, we can obviously glean the convening authority's intent was not to grant Appellant relief with respect to the adjudged reduction in rank. Finally, Appellant makes no argument on appeal that he was prejudiced by the convening authority's failure to either approve, disapprove, commute, defer, or suspend the reduction in rank in whole or in part. We conclude Appellant did not suffer material prejudice to a substantial right.

**E. Timeliness of Appellate Review**

**1. Law**

Whether an appellant has been deprived of his due process right to speedy post-trial and appellate review, and whether constitutional error is harmless beyond a reasonable doubt, are questions of law we review de novo. *United States v. Arriaga*, 70 M.J. 51, 56 (C.A.A.F. 2011) (citing *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006)).

A presumption of unreasonable delay arises when appellate review is not completed and a decision is not rendered within 18 months of the case being docketed. *Moreno*, 63 M.J. at 142. If there is a *Moreno*-based presumption of unreasonable delay or an otherwise facially unreasonable delay, we examine the matter under the four factors set forth in *Barker v. Wingo*, 407 U.S. 514,

530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135 (citations omitted). *Moreno* identified three types of prejudice arising from post-trial processing delay: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of a convicted person's grounds for appeal and ability to present a defense at a rehearing. *Id.* at 138–39 (citations omitted).

"We analyze each factor and make a determination as to whether that factor favors the Government or [Appellant]." *Id.* at 136 (citation omitted). Then, we balance our analysis of the factors to determine whether a due process violation occurred. *Id.* (citing *Barker*, 407 U.S. at 533 ("Courts must still engage in a difficult and sensitive balancing process.")). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* (citation omitted). However, where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

Recognizing our authority under Article 66(d), UCMJ, we also consider if relief for excessive post-trial delay is appropriate even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 221, 225 (C.A.A.F. 2002).

**2. Analysis**

Appellant's case was docketed with the court on 10 July 2020. The overall delay in failing to render this decision within 18 months is facially unreasonable. *See Moreno*, 63 M.J. at 142. However, we determine no violation of Appellant's right to due process and a speedy appellate review. The reasons for the delay include time required for Appellant to file his brief on 13 October 2021, and the Government to file its answer on 17 November 2021.

Analyzing the *Barker* factors, we find the delay is not excessively long under the circumstances. This court granted 13 enlargements of time for Appellant to prepare his brief in support of the assignments of error and issues he raised. Appellant's 13 enlargement requests apprised the court of the length and complexity of the case, not least of which were Appellant's numerous motions. Some of the delay is attributed to a change in Appellant's detailed appellate defense counsel 11 months after the case was docketed, and other obligations articulated by counsel. Appellant's case required counsel for both parties, and this court, to review a 17-volume record with 1,436 pages of transcript.

There are 56 prosecution exhibits, 2 defense exhibits, and 85 appellate exhibits. We also note there were sealed materials in this case and Appellant's counsel did not request to view these materials until 21 September 2021.

The court substantially affirms the findings and sentence as reassessed in this case after examining assertions of error that occurred at trial and sentencing. Moreover, Appellant has not asserted his right to speedy appellate review or pointed to any particular prejudice resulting from the presumptively unreasonable delay, and we find none. Finding no *Barker* prejudice, we also find the delay is not so egregious that it "adversely affects the public's perception of the fairness and integrity of the military justice system." *See Toohey*, 63 M.J. at 362. As a result, there is no due process violation.

In addition, we determine that Appellant is not due relief even in the absence of a due process violation. *See Tardif*, 57 M.J. at 223–24. Applying the factors articulated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we find the delay in appellate review justified and relief unwarranted.

**F. Sentence Reassessment**

Because we are setting aside the specification of child endangerment by culpable negligence *resulting in harm*, and instead affirming a finding of guilty as to the LIO of child endangerment by culpable negligence, we reassess Appellant's sentence. This court has "broad discretion" when reassessing sentences. *United States v. Winckelmann*, 73 M.J. 11, 12 (C.A.A.F. 2013). Our superior court has repeatedly held that if we "can determine to [our] satisfaction that, absent any error, the sentence adjudged would have been of at least a certain severity, then a sentence of that severity or less will be free of the prejudicial effects of error." *United States v. Sales*, 22 M.J. 305, 308 (C.A.A.F. 1986). This analysis is based on a totality of the circumstances with the following as illustrative factors: dramatic changes in the penalty landscape and exposure, the forum, whether the remaining offenses capture the gravamen of the criminal conduct, whether significant or aggravating circumstances remain admissible and relevant, and whether the remaining offenses are the type that we as appellate judges have experience and familiarity with to reliably determine what sentence would have been imposed at trial. *Winckelmann*, 73 M.J. at 15–16.

The penalty landscape in Appellant's case has changed. Setting aside the conviction of child endangerment by culpable negligence resulting in harm, and finding Appellant guilty of the LIO of child endangerment by culpable negligence, the maximum authorized confinement of seven years is reduced to six years. However, the other sentence components remain unchanged. Taking

into consideration the facts of this case, we can confidently and reliably determine that absent the error, the members would have sentenced Appellant to the same sentence had he been convicted of the LIO.

## III. CONCLUSION

The finding of guilty as to child endangerment by culpable negligence resulting in harm in the Specification of Charge I is **SET ASIDE**. A finding of guilty of the lesser-included offense of child endangerment by culpable negligence is **AFFIRMED**. The findings of guilty, as modified, and the sentence as reassessed, are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings, as modified, and the sentence, as reassessed, are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court